## Davis v. Chesapeake & Ohio Railway Company.

(Decided October 29, 1915.)

### Appeal from Greenup Circuit Court.

1. Master and Servant—When Master Not Liable For Injury to Servant.—A competent and experienced servant, charged with the duty of keeping in repair a water column at a depot, and who, under a general order from a superior, previously given, undertakes the repairing of a leaking valve in the water column, the danger of doing which is obvious and, therefore, bound to be known to him, cannot, if injured by falling from the column while engaged in such work, recover damages of the master for such injury. Especially is this true where the injured servant, by reason of his skill and experience, had for several months before the accident been entrusted with the work of keeping the water column in repair.

2. Master and Servant—Doctrine of Safe Place and Safe Appliances. —When Not Applicable.—When the servant, by reason of his skill and experience, is put in charge of a pumping station and the work of keeping in repair a water column used in connection therewith, the rule that his master must use ordinary care to provide him a safe place to work has no application where the danger of performing such work is open and obvious. In such case the servant must protect himself against such danger, and he assumes such risks as are ordinarily incident to such work, as he is charged with the duty of inspection and allowed to determine the manner of doing the work.

3. Master and Servant—Employers' Liability Act—Action Under— Defense of Assumption of Risk.—The elimination of the defense of assumption of risk by the Employers' Liability Act of April 22, 1908, Section 4, in any case where the violation by the carrier of any statute intended for the safety of employes contributed to the injury or death of the employe, plainly evidences the legislative intent that in all other cases such assumption of risk shall have its former effect as a complete bar to the action.

ALLEN D. COLE for appellant.

WORTHINGTON, COCHRAN & BROWNING and PROCTOR K. MALIN for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

This action was brought by the appellant, J. F. Davis, to recover of the appellee, Chesapeake & Ohio Railway Company, damages for injuries sustained while he was engaged in repairing a leak in its water column at South Portsmouth, Kentucky, from which he fell during the

progress of the work or after its completion, the fall resulting in the breaking of a bone in his hand, the fracture of two of his ribs, and other bodily hurts of a less serious nature.

It is, in substance, alleged in the petition as amended, that appellant's injuries were caused by the negligence of appellee in failing to furnish him a ladder for use in making the repairs on the water column, and in permitting a valve of the water column to become and remain so defective as that large quantities of water escaped and fell upon the place on the water column where appellant was compelled to ascend and descend in doing the work of repairs necessary thereon, which caused his feet to slip and his body to fall, and resulted in the injuries mentioned; that the work he did upon the water column was performed in pursuance of an order given him by an agent of appellee, his superior in authority, and that the defective and dangerous condition of the water column was not known to him when he began the work of repair required, but was known to appellee.

Appellee's answer traversed the averments of the petition, and alleged assumption of risk and contributory negligence on the part of appellant. On the trial the circuit court, at the conclusion of all the evidence, peremptorily instructed the jury to find for the appellee, which was done, and judgment rendered accordingly. The appellant was refused a new trial, hence this appeal.

The facts, as developed by the evidence heard on the trial, show that appellant was in the employ of appellee as a pumpman, at South Portsmouth, that his duties consisted in running a gasoline engine during the daytime, and keeping in repair the two water columns maintained by appellee at its station in South Portsmouth, these columns being supplied with water pumped into them by the gasoline engine operated by appellant. On the night of October 6, 1911, appellant was informed by appellee's night pumpman, whose name is Smith, that one of the water columns was leaking, and Smith advised him to repair same, as was his duty; whereupon appellant, shortly after midnight, started toward the depot for the purpose of repairing whatever defect there was in the column. While on his way to the depot he got from his mail box a letter from A. B. Allen, his immediate superior, advising him of the defect in the water column and of the necessity of his repairing same. Upon reach-

ing the water column appellant found upon investigation
that the leak was caused by a defective valve seat, which
he immediately undertook to repair and did repair. In
performing this work he climbed up on top of the
water column. While there a train came in and stopped
at the column. After completing the repairs appellant
attempted to get down from the column by descending
onto the tender of the engine standing below, thence to
the ground. According to his statements the top of the
water column was wet, owing to the leaking of water re-
sulting from the defect he had repaired, which rendered
the pipe slippery; and that while descending from the
column to the tender his foot slipped on the wet pipe,
causing him to fall and sustain the injuries complained
of.

It is apparent from the evidence that the service per-
formed by appellant in repairing the water column was
a part of the work for which he was expressly employed;
that the work he did was not performed under the super-
vision or direction of any superior officer or employe of
appellee, but according to his own judgment after an
inspection of the defect. Neither the notice from Smith,
his fellow pumpman, of the necessity of making the re-
pairs, nor the order from his superior, Allen, received
while he was on his way to the water column, contained
any direction as to the manner in which the work should
be performed. They left to appellant the inspection and
ascertainment of the defect, as well as the method of re-
pairing it. Moreover, the evidence shows that appellant
was experienced in the work of making such repairs, that
he had for a year or more kept the two water columns
of appellee at South Portsmouth in repair, and that he
was thoroughly familiar with the construction of both
and with the means necessary to be used in reaching the
place where the repairs in this instance were made. This
familiarity with the water columns and the means of
making such repairs as the one in question, make it rea-
sonably apparent that appellant at the time of receiving
his injuries was not called upon to meet any danger of
which he was ignorant, or without means of ascertain-
ing. He also knew from an inspection of the defect and
pipe before he attempted to descend from the water
column, that water was leaking on the pipe by which he
attempted to descend, and of its slippery condition, in
view of which he is estopped to claim that the risk or

danger he encountered from the slippery condition of the pipe in attempting to get down from the water column was unknown to him.

He also knew that the risk attending his work was necessarily greater at night than it would have been in the daytime, and if the one lantern with which he was at the time provided gave insufficient light he ought to have provided himself with a second lantern before undertaking the repairs. It is true, as claimed by appellant, that he was not provided by appellee with a ladder upon which he could have climbed to the defect in the water column and descended therefrom; but he does not allege, nor does the evidence show, that there had ever been a ladder used in making repairs upon the water columns, or that he had, in making previous repairs thereon, used a ladder or at any time advised appellant of the necessity of its use. So, whatever risk attended appellant's climbing to the place of the defect or descending therefrom without the use of a ladder, was known to him before and when he undertook the work of making the repairs on the water column.

It is our conclusion that the facts of this case place it in that class of cases to which the rule, that the master owes the servant the duty of furnishing him a reasonably safe place to work or reasonably safe tools with which to perform the work, does not apply, because the servant, by reason of the nature of his employment and the service required of him, is himself charged with the duty of inspection and seeing to it that the place of his work and the appliances with which he must perform it are reasonably safe for its performance.

In Daisey v. Wagner, et al., 162 Ky., 554, will be found the latest statement of the rule in question as declared by this court. In that case the plaintiff sued to recover of the defendant damages for injuries he sustained by falling from a building upon which he and other employes of the defendant were engaged in placing a tile roof; the negligence complained of being the act of the defendant in requiring a steep roof to be put on without first providing either gutters or hangers, by means of which plaintiff would have been enabled to use ladders upon the roof while engaged in the work of placing and securing the tiles in position. In the opinion it is said:

"The work attempted to be done by appellant was in itself hazardous and the danger of its performance obvious to a person of even less experience than was possessed by him. Being in charge of the work as foreman because of his experience and skill, he will not be heard to say that he did not know of the danger. Therefore, such risks as would ordinarily be incident to such work must be regarded as having been assumed by him. The duty of the master with respect to the furnishing of a safe place or safe premises for the performance of such work as fell to the lot of appellant can have no application. Therefore, the master is not, in a case like this, charged with the duty of exercising ordinary care to discover the dangerous or unsafe place, and is not liable in damages for an injury to the servant because of the dangerous condition, for the danger being obvious, the duty of protecting himself against it is shifted to the employe. So, assuming in this case that appellant's injuries were received as alleged in the petition, as the condition which caused them were openly visible to him and the work was to be performed in accordance with his judgment as appellees' foreman, there being no assurance by the appellees of the safety of the place (even if such assurance under the circumstances could have shifted the liability), nor promise by appellees to provide other appliances of greater safety, we can but hold that appellant assumed the dangers incident to the performance of the work, for which reason he cannot recover damages."

The above excerpt from the opinion is but a restatement in different language of the same rule announced by the court in Russell v. W. E. Caldwell Co., 158 Ky., 229; Ballard & Ballard v. Lee's Adm'r., 131 Ky., 412; Wilson v. Chess & Wymond Co., 117 Ky., 567; Louisa Coal Co. v. Hammond's Adm'x, 160 Ky., 271; Logan's Adm'r v. Sherrill-King Mill & Lumber Co., 160 Ky., 295; Williams Coal Co. v. Cooper, 138 Ky., 287; Mallory v. Pazert, 120 S. W., 289; Wright v. Telephone & Telegraph Co., 137 Ky., 303; Standard Oil Co. v. Watson, 154 Ky., 550; Dyer v. Pauley Jail Bl'dg Co., 144 Ky., 592.

The contention of appellant that he was working under the direct orders of a superior officer is wholly without merit. It is true he testified that he received an order from his immediate superior to make the repairs on the water column, but he admitted that he

would have made the repairs without this order, because of the previous notice from Smith, his fellow pumper, of the necessity therefor; and furthermore, that it was a part of his duties as day pumpman to make all necessary repairs in the water columns, whether required to be performed in the daytime or at night; in fact, when the order was received from his superior he was on his way to make the repairs. So, in no event was the order anything more than a general order to appellant to do what was one of the ordinary duties of his employment. The order did not, in fact or as a matter of law, impose any greater responsibility upon him than he would otherwise have incurred. The effect of such an order is considered and passed on in L. & N. R. Co. v. Stanfill, 32 R., 1043, 107 S. W., 721.

Stanfill was a brakeman in the service of the railroad company on a work train. There was one other brakeman on it besides himself. While coupling an extra tank to the caboose his hand was caught between the bumpers and all his fingers mashed off. He sued to recover damages for the injury and obtained a verdict for $5,500.00 in the circuit court. The judgment was reversed. The negligence charged was that the bumpers were defective and plaintiff's injuries were caused by their dangerous condition. He claimed to have made the coupling by order of the conductor. The two brakemen, while asleep in the caboose at a station; were awakened by the conductor, who told them to "get up and get out of there; it is time to go to work. Get up and couple up; it is time to leave." The only coupling to be made was that between the tank and the caboose. This coupling was made by the plaintiff, who had served the railroad company on that train for about four months. The coupling had often been made by him and he well knew the defective condition of the drawhead and how the coupling was made. In the opinion it is said:

"The rule in Kentucky is that ordinarily a servant, who knows the risk and understands the danger, cannot recover for his injury where he voluntarily takes the risk. (Dow Wire Works v. Morgan, 29 R., 854; Wallace v. Bach, 30 R., 69; Bollington v. L. & N., 30 R., 1260; Avery v. Lung, 32 R., 702, 106 S. W., 865.) An exception is made to this rule where the servant acts in obedience to the specific order of his superior and the risk is not so imminent that a person of ordinary prudence would

refuse to take it, but the proof in this case does not bring it within the exception. There was no order from the conductor to Stanfill to make the coupling in question. There was simply a general order to both of the brakemen to 'get up and couple up, it is time to leave.' This left either one of them to do the work, and it left the one who did the work to choose his own mode of doing it. A general order from a foreman to proceed with the usual business of the day will not impose upon the master any greater responsibility than he ordinarily incurs. To hold otherwise would be to entirely ignore the rule that the servant cannot recover for the risks which he assumes, for, when servants are told to go to work every morning, they are expected to go about their usual business and do it in the usual way. In order to bring a case within the exception above referred to there must be an order from the master to the servant to do the particular thing at that time. The conductor was in the caboose. It was the brakeman's duty to get the train ready to start, and after telling them 'to get up and get out and couple up,' he paid no further attention to them. If the conductor had been present at the time the coupling was made, and Stanfill had objected to making it, and the conductor had directed him to make it, a different question would be presented; but here the sum of the evidence is simply that the conductor told the brakeman to get up and get the train ready to leave, and Stanfill, in obeying this order, went out and undertook to make this coupling. He knew the condition of the drawheads as well as the conductor. The danger was perfectly patent. He understood the danger before he was hurt as well as after he was hurt. He had never complained of the use of the link and pin or objected to making the coupling with them. As a matter of fact, such couplings were in general use a few years ago on all such trains, and they are still often used on work trains and in an emergency.''

In this case, as in that, the servant chose his own way of doing the work, and made no complaint to any one. The condition of the water column was, as before stated, actually known to him and the danger fully understood, as well before and when he received his injuries, as afterwards. On the state of case here presented, the conclusion is inevitable that appellant assumed the risk and danger that resulted in his injuries;

in other words that the injuries resulted from the means adopted by him in performing the work of repairing the water column or for quitting the place of work after its completion; consequently they were caused and sustained by reason of his negligence, which absolves appellee from the liability attempted to be imposed upon it in this action. As said in Louisa Coal Co. v. Hammond's Admr., 160 Ky., 271:

"A servant is not ordinarily required to make a minute or detailed examination of the place where the master puts him to work, nor to take notice of any defects which would not be apparent to one who usually has neither time nor opportunity for more than a casual, hurried glance at the place of work or the instrumentalities, but is entitled to rely on the master's having adequately discharged his primary duty of using ordinary care to make the place of work and instrumentalities of work reasonably safe for his use. Where, however, the servant, as in the instant case, is the representative of the master, and in control of the place of work, or instrumentalities for doing it and the manner of its performance; if he himself undertakes its performance, he assumes, not only the risks or dangers that are obvious, but also such as ordinary care on his part in inspecting the place or instrumentalities of work before beginning it, could have enabled him to discover."

Here appellant alone was in charge of the work. He alone knew whether it was safe or unsafe to attempt its performance in the manner pursued by him. He was charged with the duty of exercising ordinary care to ascertain whether the place and the instrumentalities were reasonably safe for the work he had to perform, and he admits that he saw and knew the wet and slippery condition of the pipe before he fell from the water column and was injured. These facts necessarily bar a recovery, for his injuries were incidental to and resulted from his assumption of the risk he knowingly incurred by his attempted use of the wet pipe in descending from the water column.

The fact that the action was brought under the Federal statute known as the "Employers' Liability Act," does not affect the question under consideration. Here there was no violation by the appellee of any provision of that statute. The evidence furnishes no proof that it negligently used in operating its railroad a defective appliance, which of itself caused the appellant's injury.

The defect in the valve of the water column, being slight and of a temporary character, was repaired immediately after its discovery by appellant. Whether the defect was the result of accident or wear and tear does not appear, but the evidence fails to show that it was attributable to the appellee's negligence. The appellant was not injured by the defective valve, but by his attempted use of a pipe in descending from the water column after repairing the valve. The pipe contained no defect, but was wet and slippery from the leaking of water from the valve, which made its use in the manner attempted by appellant obviously dangerous, which danger, as already shown, was known to him.

In Seaboard Air Line R. Co. v. Horton, 233 U. S., 492, it was held:

"The elimination of the defense of assumption of risk by the 'Employers' Liability Act' of April 22, 1908 (35 Stat. at L., 65, Chap. 149, U. S. Comp. Stat. Supp., 1911, page 1322), Section 4, in any case where the violation by the carrier of any statute intended for the safety of employes contributed to the injury or death of the employe, plainly evidences the legislative intent that in all other cases such assumption of risk shall have its former effect as a complete bar to the action." Southern R. Co. v. Crockett, 234 U. S., 725.

The doctrine deducible from the cases *supra*, and others involving this question, decided by the Supreme Court, seems to be that the defense of assumption of risk is available to an interstate carrier under the "Employers' Liability Act" as at common law, except in the cases mentioned in Section 4 of that act, *i. e.* "any case where the violation by such common carrier of any statute intended for the safety of employes contributed to the injury or death of such employe."

It is manifest that even if there had been evidence conducing to prove that the wet and slippery condition of the pipe on the water column was attributable to the negligence of appellee, no doubt could exist of its right to rely upon the defense of the assumption of risk, for, according to the undisputed facts, the danger to which appellant subjected himself in attempting to make use of the wet pipe in descending from the water column, was so obvious and imminent that an ordinarily prudent person could not, under the circumstances, have failed to know and appreciate it. It therefore follows that the giv-

ing of the peremptory instruction by the trial court was not error.

We have been unable to discover any error in the admission or rejection of evidence. For the reasons indicated the judgment is affirmed.